WILLIAM H. PARISH, as Administrator, etc., of EARL PARISH, Deceased, Respondent, v. BYRON D. JUCKETT, Appellant.

(Third Department, May 7, 1913.)

DECEDENT'S ESTATE—SUIT BY ADMINISTRATOR TO RECOVER MONEY OF DECEDENT—FRAUD AND UNDUE INFLUENCE—GIFT—EVIDENCE.

Action by an administrator to recover certain sums of money received by his intestate from the sale of land, and alleged to have been obtained from him by the defendant, with whom he lived until his death, by the exercise of fraud and undue influence. Evidence examined, and *held*, that the moneys were voluntarily given by the decedent to the defendant, without fraud and undue influence, and that a judgment for plaintiff should be reversed and a new trial granted.

KELLOGG, J., dissented.

APPEAL by the defendant, Byron D. Juckett, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Washington on the 10th day of October, 1912, upon the decision of the court after a trial before the court without a jury at the Washington Trial Term.

J. Sanford Potter, for the appellant.

Erskine C. Rogers, for the respondent.

LYON, J.—This appeal is from a judgment entered upon a decision of the court upon a trial without a jury, determining that the sums of $150 received by plaintiff's intestate, Earl Parish, in March, 1907, from the sale of a place belonging to him at Dresden, Washington county, N. Y., and $2,116.70 received by him in June, 1908, as an heir at law of one Breese, who died the preceding year, were obtained from decedent by de-

fendant by the exercise of fraud and undue influence. The complaint alleges that at the time said moneys were obtained from decedent he was living with defendant and was under defendant's exclusive control, and that at such times the defendant was acting in a fiduciary capacity, and by fraud and undue influence induced decedent to place in defendant's hands the said sums of money, and that after obtaining possession thereof the defendant wrongfully and fraudulently converted the same to his own use, and has refused to pay the same to plaintiff after demands duly made. The complaint also alleges that after receiving said sum of $2,116.70 the defendant refused to allow any of the relatives of decedent to visit him, but assumed absolute control over him and over his property to the exclusion of his relatives up to the time of his death. The answer admitted the allegations of the complaint as to the death of Earl Parish, the ownership of the Dresden property, the receipt by Earl Parish of moneys from the Breese estate, and the refusal of defendant to pay any moneys to plaintiff, but denied all the remaining allegations of the complaint. Upon the trial defendant's counsel relied upon the sums of money above mentioned being gifts by the decedent to the defendant. With the conclusions of the learned trial justice holding that the above-mentioned sums of money were obtained by defendant by fraud practiced upon and undue influence exerted by defendant over the decedent; that decedent did not intend to make a gift to defendant of the moneys received from the Breese estate, and that plaintiff was entitled to judgment against the defendant for the aggregate of said two sums with interest thereon from the time of the receipt thereof by defendant, we cannot agree, and think that such conclusions are not justified by the evidence. In order to set forth the reasons for our non-concurrence, it will be necessary to review at some length the evidence given upon the trial.

It appears that in the latter part of the winter of 1907 Earl

Parish, the decèdent, who was then seventy-nine years of age, in poor health, suffering from an attack of the grippe and an object of charity from the neighbors, having neither wife nor children, was living alone on a small place which he owned at Dresden in the county of Washington; that on March 30, 1907, decedent conveyed his Dresden property to one Adams for $150, the purchase price being paid by Adams to defendant; that defendant then took decedent to defendant's own home in the town of Whitehall, where he kept him until the month of June, 1907, when decedent was taken by the overseer of the poor, defendant accompanying them, to the county poorhouse near Argyle and left there; that decedent remained at the poorhouse for a few weeks, and being dissatisfied left of his own accord, walking to Argyle, a distance of about two and one-half miles, from which place, traveling by stage and car, he reached Hudson Falls, where he visited William H. Parish, the plaintiff, for about three weeks. From there decedent went to defendant's house, where he remained for about two months, when the defendant took him as far as Fort Edward on his way to the poorhouse, where he remained until about January, 1903, when the defendant, having probably learned of property having fallen to him upon the death of decedent's nephew Breese, defendant went to the poorhouse and took decedent to defendant's house, where decedent remained until the time of his death in January, 1910. It further appears that upon bringing decedent back to defendant's home, defendant caused an attorney to be employed to look after the interests of decedent in the Breeses estate, and that while the question as to the respective rights of decedent and of cousins of Breese in his estate was pending undetermined, decedent went in the company of the defendant and the attorney from Whitehall to Troy, and there attended a term of the Surrogate's Court. Following the decision of the surrogate in favor of decedent, a check for $2,116.70, signed by the attorneys for the estate payable to the order of Earl Parish, of date June

13, 1908, was delivered to defendant, and on June fifteenth such check bearing the indorsement of Earl Parish was presented by the defendant at a bank in Whitehall and $416.70 drawn by him in cash and the balance of $1,700 deposited by the defendant to the credit of his own account in the bank, where it still was at the time of the trial. It also appears from the evidence that soon after receiving the proceeds from this check, the defendant constructed a one-room frame building about fifty feet from his house, in which decedent resided from that time to the time of his death, eating at defendant's table with the family excepting during an occasional day or two, when, being unable to go to defendant's house, defendant carried his meals to him. Decedent died suddenly and unexpectedly from strangulation produced by a fit of coughing, to which for years he had been subject. Defendant paid the funeral charges. Following the death of Earl Parish inquiries were made of defendant by the next of kin and by the attorneys for the administrator as to the assests of his estate, in answer to which defendant stated that decedent left no property whatever. Later plaintiff was appointed administrator of the estate of deceased and demand made by him upon defendant that he pay over the moneys received by the defendant from Earl Parish, deceased, which defendant refused to do, whereupon this action was brought.

As bearing upon the issues in this action, the relations between defendant and deceased and his relatives is important. It appears from the evidence that from early life the relations of the defendant and decedent had always been of the most friendly nature; that they were boys together, seeing each other almost daily from the time the defendant was fourteen util he was twenty-two years of age; that with the exception of thirteen years, when the defendant lived in Nebraska, decedent had been a frequent visitor at the house of defendant, often staying for weeks at a time; that during the periods of decedent's work as a carpenter among the farmers of the neighborhood he made

defendant's house his headquarters, often coming Saturday night and staying over Sunday. That decedent recognized and appreciated this friendship during the whole period of the transactions which have been the subject of examination during this litigation is fully established by the evidence. Witness Bartholomew, the justice of the peace, who drew the deed of the Dresden place from decedent to Adams, testified that decedent said defendant was quite a good friend of his, and that he considered him the best friend he had, heard him say it repeatedly, he always talked about Mr. Juckett. Witness Clemons testified that the relations between decedent and defendant were always friendly, and that while decedent was sick at Dresden defendant several times called witness by phone and asked witness to telephone him in case decedent neeeded held. Special Surrogate Davis testified that he had been an acquaintance of decedent for twenty-five years, and that decedent told him in January or February, 1908, that defendant had been better to him than anybody else; that he had been an old friend of his; that his relatives never would help him any, and that he wanted defendant to have the money. Witness Brown testified that he had known decedent for thirty-five years; that he lived about one-half mile from defendant's, and had heard decedent say often that defendant was a friend of his; that his wife was a good woman, and that they had taken a great deal of pains with him; that he liked them very much. Witness Johnson testified that he had heard decedent say that he liked defendant and his wife very much. Witness Stott, assistant superintendent of the county house, testified that decedent was lonesome at the county house and wanted to go back to Dresden, and finally left of his own accord, walking as far as Argyle, which was two and one-half miles distant; that defendant was the only man decedent ever spoke to him about, and that he called defendant his friend, and that defendant visited

decedent two or three times while he was an inmate of the county house.

As bearing upon the relations between deceased and his relatives, witness Bartholomew, the justice of the peace, testified that he had heard decedent, speaking of his relatives, say that they were no good; that they did not come to see him and paid no attention to him, cared nothing about him; and Special Surrogate Davis testified as before stated.

The next of kin of the decedent were three nephews and a niece. One of the nephews was the plaintiff, who testified that while he and his brother were keeping bachelor apartments at Hudson Falls in the summer of 1907 decedent stopped with them for about three weeks after he had left the county house, and that preceding such visit the witness had not seen the decedent for a few years; that the witness visited the decedent while he lived in Dresden fifteen or twenty years ago, and the decedent came to his house when the witness' father and mother were living, eleven or twelve years ago. The niece, the witness Mary Brown, testified that she resided in New York city and was engaged in theatricals, musical comedy; that the decedent visited her without invitation and unexpectedly about three years previous to his death, remaining about three weeks, going to New York as he stated to collect a bill; that in the summer of 1907 she sold her furniture and went on the road. So far as appears from the evidence none of his relatives in his later years offered him a home, visited him, contributed a dollar to his support or manifested the least interest in him aside from the niece who testified that she corresponded with him.

As to the sale of the Dresden place and the receipt by the defendant of the proceeds thereof, it appears from the testimony of Bartholomew, the justice of the peace, that he went to the house to prepare the deed at the request of decedent, that decedent told him what he wanted, the defendant and others were present, defendant signing the deed as a witness, and that

after the deed had been drawn and delivered the purchaser tendered the money to decedent, whereupon the latter said, "Give it to Mr. Juckett, he is going to settle up my business," whereupon the purchaser handed the $150 to defendant. Adams, the grantee, also testified that decedent told the witness to give the money to defendant. That defendant disposed of the money satisfactorily to the decedent would appear from the testimony of Barrett, the overseer of the poor, to the effect that when Barrett took decedent to the poorhouse in June, 1907, decedent told him he had nothing to support himself with, made no claim that defendant had any of his money, and spoke of defendant and himself being good friends and said he would like to make his home with defendant, but as defendant's wife was sick it was not convenient for him to take him. Being dependent upon charity previous to the time of the sale of the Dresden place, it may well be believed that his money as well as his credit had been fully exhausted. The defendant attempted to testify as to the disposition of these moneys, but under plaintiff's objection the testimony was excluded as being a personal transaction between the witness and decedent. The testimony will be scanned in vain for any evidence of fraud or unfair dealing upon the part of defendant relative to the sale of the Dresden property or the disposition of the proceeds therefrom except the testimony of Murray, an inmate of the county house, and a former boatman and canal driver, which is effectively contradicted by the action of decedent in himself making application to the overseer of the poor to be taken to the county house, and his failure to make any such claim; but on the other hand, his speaking in the most kindly manner of both defendant and his wife.

As to the receipt by the defendant of the check for $2,116.70 from the Breese estate, it is probable that defendant was moved to go to the county house and bring deceased to defendant's home by information that there was a probable interest in the

Breese estate belonging to deceased as an heir at law. Neither taking deceased from the county house nor being the means of employing an attorney to look after his interests was necessarily proof of a fraudulent intent upon the part of defendant. A life long friendship alone would have prompted the doing of those acts which were entirely consistent with a laudable and honest intent upon the part of the defendant to see that decedent got what he was entitled to out of the Breese estate. There is no evidence of any improper action upon the part of the attorney, and his official position for many years in Washington county would seem to furnish proof of his standing in the community. That the employment of a lawyer to look after the interest of the deceased was justified is amply shown by the doubt in the mind of the surrogate as to whether deceased was entitled to receive a distributive share of the Breese estate, as cousins were making claims thereto. What the transaction was which brought about the indorsement of the check by deceased and its transfer to defendant does not appear. The law has closed the mouth of the defendant as to all explanations as to the transactions between himself and deceased relative to that matter. However, as bearing upon the probable arrangement under which the check for deceased's share in the Breese estate was transferred to defendant, Special Surrogate Davis testified that in January or February, 1908, deceased told him he wanted him to get the money from the Breese estate and let defendant have it. Witness Brown testified that deceased told him only three or four months before he died that the defendant had his money and was going to take care of him. Witness Clemons testified that he ate dinner with deceased in defendant's house in the spring, which must have been of 1909, and that he had a talk with deceased in the little house, when deceased told him that he was feeling all right and kind of enjoyed the place he had, and that " I am going to stay here, and I am going to give him what I have got, and he has agreed to take care of me."

It also appears that soon after the receipt of the check the defendant constructed the small building in which deceased resided up to the time of his death. That act does not appear to have been properly the subject of criticism. The deceased was without wife or family and had been accustomed to living alone and doing his own cooking. He had physical infirmities which at times made his presence in the house objectionable and impracticable. At times he got up and went about the house at night. During three years preceding her death in November, 1908, defendant's wife was an invalid, and during the latter part of her life could not lie down, but was obliged to sleep in an upright position on the couch in the sitting room. Thus the comfort of defendant's family and of deceased himself required the construction of the little house. This was a frame building, newly built, one and one-half stories high, with a chimney, shingled, supported upon a cement foundation wall, having one room fourteen by seventeen, lathed and plastered throughout, with the ceiling papered, sided with building paper and over that novelty siding. Separated by a partition was a narrow hallway leading to the toilet, which deceased could reach by simply opening the door and without going out of doors. The room was furnished with a corded bed, which deceased preferred, with straw tick, bedding, a new cook stove, two or three chairs, table, looking glass, tea kettle and dishes. Attached to the building was a shed for wood and a place where decedent kept the tools which he did not dispose of before leaving Dresden. The little house would seem to have compared favorably as a place for decedent to live with the Dresden place. That he was comfortable and satisfied there was testified to by several witnesses.

The charge made in the complaint, that after receiving the moneys from the Breese estate the defendant refused to allow any of decedent's relatives to visit him, is wholly unsupported by the evidence. So far as appears not one of his next of kin who are claiming to be entitled to these moneys visited dece-

dent or manifested any desire whatever to visit him at any time during the last three years of his life, either while he was living at Dresden or was in the poorhouse, or was at defendant's, although, as was stated on the argument, the nephews resided in the same county and within a few miles of where decedent was. That the decedent. was not under any restraint while living in the little house is further established by the evidence. The only testimony to the contrary is that of a second or third cousin, who testified that he knew of decedent's interest in the Breese estate early in 1908, who on one of the occasions while passing defendant's farm stopped with his son and talked with decedent, and who testified that decedent told him that he could not go anywhere and that they would not take him anywhere, and who says he promised decedent to send a rig for him to take him away but never did it, and who admits that he might have made the very uncomplimentary remark regarding decedent appearing in one of the questions asked him. The son was not called as a witness to corroborate the father, and no explanation was made for not calling him. Contradictory of this claim of plaintiff are the declarations of decedent, hereinbefore referred to, the testimony of several witnesses who were at defendant's while decedent was there, and particularly the testimony of the witness William Brown, who testified that decedent frequently walked to his house, a half mile from defendant's house, and on one occasion, in September or October before he died, staying all day. It hardly seems possible that had decedent been restrained of his liberty during the two years that he lived at defendant's some neighbor or other person could not have been found by plaintiff who could testify to that fact.

As to the moneys from the Breese estate having been obtained from the decedent by the defendant by fraud and undue influence, the evidence does not in our judgment sustain such conclusion. .Beyond question decedent during the last two years of his life was in feeble health and the subject of many infirmi-

ties, but the evidence is insufficient to establish mental incompetency to dispose of his property, and the learned trial justice has not found that such incompetency existed. The testimony shows that decedent was quite a reader, and that he liked to talk about the news of the day and what he had read. It can hardly be said in view of the physical condition of decedent, and his sad experiences of the preceding months and doubtless his desire to make certain some provision for his support during his remaining years, that a transfer of this money to the friend of a lifetime who alone had offered him a home and in whom evidently he had the utmost confidence, was a fraud upon decedent or even the exercise of poor business judgment upon decedent's part. Neither can it be said under all the circumstances and particularly in view of the uncertainty of the possible length of decedent's life that it was an unconscionable contract in defendant's favor. The money belonged to decedent and he had the right to dispose of it as he saw fit so long as he was mentally competent to do so and such disposition was his free act and deed.

I think the evidence warrants the conclusion that decedent fully comprehended the act of transfer of the money to defendant, that it was decedent's intention that defendant should have it, and that the act of transfer was voluntary. During the year and a half which elapsed between the time of the deposit of the check to the credit of defendant and the death of decedent no proceeding for the recovery of the money was taken by decedent, nor so far as appears any request made for its repayment.

It is claimed by the plaintiff that the testimony of the witness Mary Brown as to the conversation with the defendant relative to the receipt of the moneys by him from decedent was not denied by the defendant, and hence must be considered as admitted. The defendant was asked to give that conversation in substance, and he gave it as he claimed it to have been, which

did not include the statement testified to by the witness **Brown.**
The defendant then testified that such was substantially all that
was said.   This I think was intended to be and should be con-
sidered as denying such testimony.

Criticism is made of defendant on account of his answers
to inquiries made of him relative to the estate of the decedent.
While his answers were not characterized by that .frankness
with which doubtless they would have been had he been an at-
torney or a business man of experience instead of a layman and
a farmer, or even acting under legal advice, yet there is nothing
in his answers inconsistent with his denial of the claim that
these moneys were obtained by fraud or undue influence.

We think that the conclusion of the learned trial court that
these moneys were obtained by defendant by fraud practiced
upon and undue influence exerted over decedent was not justi-
fied by the evidence, and that the judgment appealed from
should be reversed and a new trial granted, with costs to appel-
lant to abide the event.

All concurred, except KELLOGG, J., dissenting.

Judgment reversed on law and facts and a new trial granted,
with costs to appellant to abide the event, the particular find-
ings of fact of which the court disapproves being findings 13, 17
and 19.